# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| SHOALS TECHNOLOGIES GROUP, LLC, | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No.: _____** |
| v. | ) ) | |
| PRYSMIAN CABLES AND SYSTEMS USA, LLC | ) ) ) | |
| **Defendant.** | ) ) ) ) ) | |

## COMPLAINT

Plaintiff Shoals Technologies Group, LLC files this Complaint against Defendant Prysmian Cables and Systems USA, LLC, and states as follows:

## INTRODUCTION

1.      This is an action to recover for damages caused by defective wire Defendant Prysmian Cables and Systems USA, LLC ("Prysmian") sold to Plaintiff Shoals Technologies Group, LLC ("Shoals") between 2020 and approximately 2022, and Prysmian's subsequent refusals to accept responsibility and compensate Shoals for the damages that Shoals has incurred and will continue to incur due to the failure of that wire.

2.      As described in more detail below, Shoals used Prysmian's wire to manufacture certain products. However, after those products were shipped to solar fields, it became evident that the Prysmian wire does not conform to industry standards, product specifications or warranties. Specifically, the wire's insulation can contract—a phenomenon commonly known as "wire insulation shrinkback" or "insulation shrinkback"—leaving the wire's conductor exposed,

1

which can lead to decreased performance and safety hazards. To date, this Prysmian wire insulation shrinkback issue has been observed in at least twenty solar fields.

3. While Shoals discontinued its use of Prysmian wire, Shoals has, as a direct and proximate result of Prysmian's conduct, already expended millions of dollars in remedial measures, and it is likely to incur substantially more in damages.

## PARTIES

4. At all times relevant hereto, Shoals was and is a Tennessee limited liability company with its principal place of business in Portland, Tennessee. Shoals' sole member is Shoals Holdings LLC, a Delaware limited liability company. Shoals Holdings LLC's sole member is Shoals Parent LLC, also a Delaware entity, and Shoals Parent LLC's sole member is Shoals Intermediate Parent, Inc., a Delaware corporation.

5. At all times relevant hereto, Prysmian is and was a Delaware limited liability company with its principal place of business in Highland Heights, Kentucky. Prysmian's sole member is GK Technologies, Inc., a New Jersey Corporation with its headquarters in Highland Heights, Kentucky.

6. Prysmian is the surviving entity of a formal merger between General Cable Industries, Inc. ("General Cable") and Prysmian Cable and Systems USA, LLC.[1] *See* Certificate of Merger, attached as **Exhibit A**.

---

[1] *Prysmian Group announces formal entity merger between General Cable Industries and Prysmian Cables and Systems USA, LLC in the United States*, available at https://na.prysmiangroup.com/press-release/prysmian-group-announces-legal-entity-integration-and-finalizes-rebranding-with-general-cable-in-the-united-states.

2

7.    As the surviving entity, Prysmian is the successor in liability for actions undertaken by General Cable prior to the merger and it is liable for actions taken thereafter.[2]

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties,[3] and the amount in controversy significantly exceeds $75,000.

9.    This Court has personal jurisdiction over each of the parties. Prysmian is subject to personal jurisdiction in Tennessee and this Court based on its regular and systematic contacts with this State, including entering into contracts with Tennessee companies and shipping product to Tennessee. Prysmian is also subject to personal jurisdiction in this state due to its wrongful actions, including but not limited to its intentional or reckless misconduct directed at Shoals, and because Shoals incurred injuries and harm sustained in this State, as set forth herein. Furthermore, Prysmian is registered with the Tennessee Secretary of State to do business in the state of Tennessee and can be served with process at CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

10.    Venue is proper in this Court under 28 U.S.C. § 1391. Prysmian has transacted business in the Middle District of Tennessee, and a substantial part of the events or omissions

---

[2] Because Prysmian is the entity responsible for General Cable's actions both prior to and after the companies' formal merger, this Complaint will refer to both entities collectively as "Prysmian."

[3] The parties in this case are limited liability companies. Their citizenship is thus determined by the citizenship of each of their members rather than the state in which they are organized. *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009); *Mendy v. Adams*, 2023 WL 4190532, at *4 (M.D. Tenn. June 25, 2023). Shoals' sole member is a citizen of Delaware, and Prysmian's sole member is a citizen of New Jersey and Kentucky. Complete diversity therefore exists here.

giving rise to Shoals' claims occurred in or were directed toward Shoals in the Middle District of Tennessee.

## **FACTUAL ALLEGATIONS**

11.     Shoals is a leading provider of electrical balance of system ("EBOS") solutions for solar power generation, battery storage, and electrical vehicle charging infrastructure throughout the United States and abroad.  In the context of solar power generation, Shoals' EBOS solutions encompass all the components necessary to transport electric current produced by solar panels to an inverter, allowing the current to be delivered to the power grid or an energy storage solution safely and efficiently.

12.     Shoals' EBOS products require a number of specialized component parts, including photovoltaic wire, which is produced for the interconnection wiring of grounded and ungrounded solar panel systems.  These polymer-insulated copper wires act as conductors, intended to carry high voltages of electricity in a safe and efficient manner.

13.     Because these photovoltaic wires carry electricity, the copper conductor must be insulated in order to ensure proper operation and safety.

14.     Shoals prioritizes obtaining quality photovoltaic wires for these reasons.  Shoals purchases these wires from a number of different suppliers to manufacture its EBOS products.

15.     With much of the wire it purchases from various suppliers, Shoals manufactures custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters where it is then delivered to the power grid or a battery storage solution. These wire harnesses are typically produced using ten-gauge (10 AWG) or twelve-gauge (12 AWG) wire where the gauge of the wire is an indication of the wire's thickness. Typically, Shoals builds these harnesses in pairs, with a red-wire harness being used for positive connections, and a

4

black-wire harness being used for negative connections.  Part of the manufacturing process in creating the wire harnesses involves placing tee joints or in-line fuses (collectively hereinafter "T-Junctions") at set intervals along the length of the wire.  These T-Junctions allow the wire harnesses to be connected to the solar panels and are a critical component of Shoals' EBOS solutions.

**Shoals' Purchase of Photovoltaic Wire from Prysmian**

16.     Prysmian manufactures a number of specialty wires, including without limitation a photovoltaic wire called "SunGen Photovoltaic Wire."  Shoals has purchased SunGen Photovoltaic wires from Prysmian for many years for use in its wire harnesses.  Initially, these purchases included orders for black 10 AWG wire ("Prysmian black wire").  In or around 2014 or 2015, Shoals began purchasing red 10 AWG wire ("Prysmian red wire") from Prysmian.  Here, the colors red and black refer to the color of polymer insulation on these wires.

17.     During the time Shoals purchased wire from Prysmian, Prysmian held itself out "as a leader in the cable and wire industry" with a "breadth of product and application engineering expertise to meet" each customer's specific needs.[4]   It also specifically pointed to its "over one hundred years of experience in developing advanced materials and compounds that deliver ground-breaking and environmentally-sound cabling innovations" in its marketing materials, and claimed its products "set the benchmark for utilities."[5]

18.     During the time Shoals purchased wire from Prysmian, Prysmian issued specification sheets for its SunGen Photovoltaic Wire to potential customers, including Shoals.  An

---

[4] General Cable website, *available at* https://web.archive.org/web/20201024170404 /https://www.generalcable.com/na/us-can/products-solutions/energy

[5] *Id.*

example of one such specification sheet from June 2017 is attached hereto as **Exhibit B**. The specification sheet for SunGen Photovoltaic Wire described itself as "spec 5851." *See id.*

19. Prysmian's specification sheet expressly marketed the SunGen Photovoltaic Wire for "interconnection wiring of grounded and ungrounded photovoltaic power systems." *See id.*

20. The same specification sheet explicitly stated that SunGen Photovoltaic Wire could handle up to 2000 volts of electricity. *See id.* ("Single conductor, sunlight-resistant, direct burial photovoltaic wire rated 90°C wet or dry, 2000 V for interconnection wiring of grounded and ungrounded photovoltaic power systems").

21. Prysmian also certified that its SunGen Photovoltaic Wire complied with certain industry standards on its specification sheet. For example, Prysmian represented that its SunGen Photovoltaic Wire complied with Underwriter Laboratories ("UL") 4703 Type PV, UL File # E343277 and UL 44 Type RHW-2, UL File # E39406. *See id.*

22. Shoals' representatives examined and relied upon Prysmian's specification sheet prior to issuing purchase orders to Prysmian for SunGen Photovoltaic Wire. Shoals' representatives ordered SunGen Photovoltaic Wire from Prysmian specifically because the representations included on Prysmian's specification sheet ensured that the wire would be capable of meeting the needs of Shoals' customers and end users. Shoals would not have purchased SunGen Photovoltaic Wire if Prysmian's specification sheet failed to state explicitly that its wire complied with UL standards.

23. Prysmian knew that Shoals relied upon Prysmian's representations within its specification sheet. Prysmian learned how Shoals utilized its SunGen Photovoltaic Wire during various meetings with Shoals' representatives. For example, Prysmian representatives visited Shoals' headquarters—where Shoals produces the T-Junctions and manufactures the wire

6

harnesses—in Portland, Tennessee to reinforce its commercial relationship with Shoals on at least one occasion in 2018. Prysmian's sales representatives also checked in with Shoals' sales representatives on a regular basis to discuss wire sales. Shoals and Prysmian therefore developed an extensive working relationship over the years, such that Prysmian knew how Shoals used its wire.

24. Prysmian sent Shoals a weekly email containing the prices ("weekly price sheets") for Prysmian black wire and Prysmian red wire, constituting an offer to purchase. These weekly price sheets explicitly incorporated Prysmian's specification sheet by describing the wire as complying with "spec 5851." An example of one such weekly price sheet is attached hereto as **Exhibit C**; *see also* Exhibit B.

25. Shoals then issued purchase orders to Prysmian, thus accepting Prysmian's offer, i.e., the weekly price sheets. These documents created binding contracts between the parties.

26. To the extent Prysmian attempted to introduce any supplemental terms into the parties' course of dealing, those terms were proposals by Prysmian, were not accepted by Shoals, and did not become a part of the parties' agreement. Furthermore, to the extent any such proposed terms materially altered the terms of the sale set forth in the purchase orders, they cannot and did not bind Shoals. *See, e.g.*, Tenn. Code Ann. § 47-2-207.

27. Prysmian manufactured the products specified in the purchase order, and shipped these products to Shoals, usually to its corporate headquarters in Tennessee.

28. With these shipments of wire to Shoals, Prysmian would typically include a certificate of compliance, certifying that the wire "was manufactured and tested in the Willimantic, CT facility in accordance with the referenced customer purchase order and meets all applicable standards." An example of one such certification of compliance is attached hereto as **Exhibit D**.

7

29.     Shoals began issuing purchase orders to Prysmian referencing its formal terms and conditions in November 2021 (the "2021 Terms and Conditions," attached hereto as **Exhibit E**). The purchase orders Shoals issued to and accepted by Prysmian from that point forward expressly indicated that the 2021 Terms and Conditions applied to the transactions contemplated by the orders.

30.     In the 2021 Terms and Conditions, Prysmian expressly warranted to Shoals that its products would:

> be free from defects in design, workmanship, and materials, (b) be selected, designed, manufactured, and assembled by Supplier based upon Purchaser's and its OEM Customer's stated use and be fit for the purposes intended by Purchaser and its OEM Customers, (c) conform to all applicable laws, orders, regulations, and standards in countries where the Products are to be sold, (d) be free of all third party rights, liens and encumbrances, and (e) not infringe or contribute to the infringement of any U.S. or foreign patent or patent right or other third party proprietary right (including any patent, trademark, copyright, industrial design rights or other proprietary right or trade secret) ('IP Rights').

*See* Exhibit E § 7.

31.     The 2021 Terms and Conditions defined the warranty period for Prysmian's products, including the SunGen Photovoltaic Wire, as "the longest of (x) the warranty provided by Purchaser to the OEM Customer, (y) the warranty period provided by the OEM Customer to the end-user/purchaser in which the Product is incorporated, or (z) any warranty period provided by applicable law." *See id.* Shoals' warranty period is typically five years.

32.     The 2021 Terms and Conditions also specified that Prysmian's SunGen Photovoltaic Wire, including Prysmian red wire, would comply with certain minimum quality standards. Specifically, Prysmian's wire (1) "must be certified to UL" and (2) "must conform with the dimensional and performance specifications published in Supplier product portfolios, datasheets, etc." *See id.* § 9.

8

33. The same document also imposed certain requirements on Prysmian as a supplier for Shoals, including that Prysmian shall (1) "participate in key measurable meetings with [Shoals] as needed" and (2) "maintain Product traceability through their own supply chain up to and including finished goods." *See id.* Furthermore, Prysmian agreed that it would, "at no cost" to Shoals, "assist [Shoals] in evaluating and resolving any detected quality problems" and "cooperate with [Shoals] to identify and or remedy any defect, default, claim of defect or other problem or quality issue relating to the Products (and related systems and components)." *See id.*

34. The 2021 Terms and Conditions also provided that Prysmian shall indemnify Shoals "against any and all losses, damages, liens, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, as incurred) arising in connection" with any causes of actions or claims arising out of, among other things, "(1) [Prysmian's] breach of its obligations, covenants, representations or warranties" outlined in the 2021 Terms and Conditions and (2) any negligent act, willful omission or willful misconduct of [Prysmian], its employees or any individuals involved in the fulfillment of [Prysmian's] obligations under these Terms or any Order." *See id.* § 8.

35. Finally, the 2021 Terms and Conditions explicitly outlined Shoals' remedies if Prysmian breaches its obligations. *See id.* § 12. Under these terms, Prysmian is obligated to reimburse Shoals:

> [F]or any incidental, consequential or other damages (including lost profits) caused by [Prysmian's] breach of these Terms or for supplying nonconforming Products, including without limitation, costs, expenses, and losses incurred directly or indirectly by [Shoals]:

a. In inspecting, sorting, storing, reworking, repairing or replacing the nonconforming Products;

b. Resulting from production interruptions;

c. Customer field service actions or other corrective service actions;

9

d. Resulting from personal injury, death or property damage caused by the nonconforming Products. [Shoals'] damages include reasonable attorneys' fees and other professional fees, settlements and judgments incurred by [Shoals] and other costs associated with [Shoals'] administrative time, labor, and materials.

e. In any action brought by [Shoals] to enforce [Prysmian's] obligations in connection with the production or delivery of Products or transition support, or for possession of property, [Prysmian] acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of these Terms and/or any Order and that, in addition to all other rights and remedies that [Shoals] may have, [Shoals] shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus [Shoals'] reasonable attorneys' fees.

*See id.*

36.     Prysmian manufactured and delivered wire pursuant to purchase orders that explicitly incorporated the 2021 Terms and Conditions by reference.

## Prysmian Red Wire and Industry Standards

37.     UL 44, to which Prysmian's specification sheet represented its red wire complied, references a test method in UL 2556 to quantify the amount of acceptable insulation shrinkback in wire. Insulation shrinkback is a gradual process dependent on both time and temperature that occurs when the insulating material around the conductor contracts in a way that exposes the conductor under the insulation. The wire at issue in this case has a polymer insulation covering copper conductor.

38.     Prysmian is aware of the phenomenon of insulation shrinkback and, at all times when selling wire to Shoals, knew or should have known of the need to have processes and tests in place to prevent unacceptable insulation shrinkback, especially in light of its express representation in its specification sheet that its wire complied with UL 44 and other industry standards.

39.     Under the test method referenced by UL 44, the polymer insulation on the

10

conductor should not contract by more than 0.16%.[6]  Insulation shrinkback of more than 0.16% is considered unacceptable and nonconforming to the UL 44 standard.

40.    Wire experiencing unacceptable insulation shrinkback can expose the copper conductor, which can result in decreased system performance in the field and safety hazards.

41.    In addition to the test method referenced by UL 44, Insulated Cable Engineers Association ("ICEA") includes a commonly used test method for measuring insulation shrinkback, ICEA S-94-649-2021, entitled "Concentric Neutral Cables Rated 5 Through 46KV" ("ICEA Test"), which is an industry standard applicable to stranded wire insulated with cross-linked polyethylene, like the Prysmian red wire at issue in this case.

42.    Per the ICEA Test requirement, wire exhibiting more than 100 mils[7] of insulation shrinkback after three testing cycles fails the ICEA Test. 100 mils of insulation shrinkback is equivalent to 0.55% insulation shrinkback, meaning the polymer insulation covering the conductor should not contract by more than 0.55%.[8]

43.    Insulation shrinkback of 0.16% (UL 44) or 0.55% (ICEA Test) or less is within

---

[6] Under UL 44, "[n]o exposed end of the conductor shall exceed 3 mm (0.12 in) in length after 24 [hours] when subjected to the test, Shrinkback, in UL 2556, CSA C22.2 No. 2556, or NMX-J-556-ANCE. As an option, if the exposed conductor length exceeds 3 mm (0.12 in), it shall not exceed 4 mm (0.16 in) in length after 7 [days]." *See* UL 44 § 5.21 (excerpt attached hereto as **Exhibit F**). According to UL 2556, the total sample length is 5 m (16 ft). *See* UL 2556 § 7.4.3 (excerpt attached as **Exhibit G**).  The total allowable percent insulation shrinkback is calculated by dividing the total allowable insulation shrinkback (8 mm, i.e., 4 mm at each end) by the total sample length. This results in a maximum allowable insulation shrinkback of 0.16%. *See* Exhibit F; Exhibit G.

[7] A mil is a unit of measurement equal to one-thousandth of an inch, or 0.001 inch. *See* Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/mil (last visited October 31, 2023).

[8] According to the ICEA Test Requirement, the total sample length is 18 inches (1.5 feet). The total allowable percent insulation shrinkback is calculated by dividing the total allowable insulation shrinkback (100 mils) by the total sample length. This results in a maximum allowable insulation shrinkback of 0.55%. *See* ICEA §§ 4.3.4 & 9.10 (excerpt attached as **Exhibit H**).

11

acceptable industry standards and test methodology, but insulation shrinkback over and above those amounts is unacceptable ("unacceptable amount of insulation shrinkback") because it may compromise performance and could create a safety hazard.

44.     Stranded wire should not exhibit unacceptable amounts of insulation shrinkback due to the interstitial interaction between the stranded wire and the polymer insulation.

45.     Stranded wire exhibiting an unacceptable amount of insulation shrinkback does not comply with accepted industry performance, nor does it comply with the pattern and practice between Prysmian and Shoals.

46.     Wire exhibiting an unacceptable amount of insulation shrinkback does not comply with UL 44 or UL 4703[9], and therefore does not conform to the standards outlined in Prysmian's own specification sheet.  *See* Exhibit B (specification sheet certifying Prysmian red wire for the "interconnection wiring of grounded and ungrounded photovoltaic power systems"). Such wire is therefore not merchantable.

47.     Wire exhibiting an unacceptable amount of insulation shrinkback likewise fails to conform with Shoals' 2021 Terms and Conditions, which expressly call for products to be "free from defects in design, workmanship, and materials," "be selected, designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] and its OEM Customer's stated use and be fit for the purposes intended by [Shoals] and its OEM Customers," and "conform to all applicable laws,

---

[9] UL 4703 § 5.3 outlines the requirements for photovoltaic wire, and specifically incorporates the construction and materials requirements contained in UL 44.  *See* UL 4703 § 5.3 (excerpt attached hereto as **Exhibit I**).  As a result, any wire that does not conform with UL 44 also fails to conform with UL 4703.

orders, regulations, and standards in countries where the Products are to be sold." *See* Exhibit E § 7.

<u>**Discovery of the Insulation Shrinkback Defect in Prysmian Red Wire**</u>

48.     In March 2022, Shoals first received a report from a customer that there was exposed copper conductor on Prysmian wire installed in the customer's solar field. Shoals notified Prysmian, and both Shoals and Prysmian went to the solar field to examine the wire.  Upon examination, Shoals and Prysmian discovered exposed bare copper conductor around T-Junctions.

49.     Prysmian issued a report to Shoals, explaining, "[s]tring tension is believed to be the primary cause of conductor exposure of the insulated wire from the end of the overmold," *See* April 11, 2022 Site Visit Report, attached hereto as **Exhibit J**, at 1-2.  Prysmian described this as a wire management or installation practice issue.  *See id.* at 1.

50.     Shoals, at its own expense, and to support its customer, replaced affected harnesses on the end user's site.  The replacement harnesses were made with Prysmian red wire and were re-installed at this site using different installation methods to address concerns related to wire management raised by Prysmian.

51.     On March 15, 2022, Prysmian conducted tests on sample Prysmian red wire exhibiting exposed conductor.  Prysmian conducted different tests to investigate the root cause of the exposed conductor, including relying on testing methodologies and standards under UL 4703 and UL 44 for determining the necessary thickness of wire insulation and testing for tensile strength, elongation, and deformation. However, Prysmian conducted an insulation shrinkback test using its own "GC Method" test, rather than using the test method referenced in UL 44.  Thereafter, Prysmian informed Shoals that the Prysmian red wire "passed" its internal "GC Method" test, and

ultimately concluded that Prysmian could not find "any anomalies with these cable's [*sic*] samples." *See* Prysmian Report, attached hereto as **Exhibit K**, at 5 & 10.

52. Relying upon the Prysmian Report, including Prysmian's representation that its red wire passed Prysmian's internal testing, and that the root cause of the exposed conductor was not due to inherent issues with Prysmian red wire's design and/or manufacture, Shoals continued to purchase Prysmian red wire.

53. Shoals has since learned that Prysmian's purported GC Method test allows for well above the 0.16% insulation shrinkback standard contained in UL 44 and the 0.55% insulation shrinkback standard contained in the ICEA Test. In fact, the GC Method test appears to allow for over 2.4% insulation shrinkback on wire, which substantially exceeds the limits of either UL 44 or the ICEA Test.[10]

54. Shoals did not know when it purchased wire from Prysmian that Prysmian's own unique testing protocol allows for 2.4% insulation shrinkback on wire. If Shoals had known this, it would not have purchased wire from Prysmian, because 2.4% insulation shrinkback is not compatible with Shoals' design, violates the representations in Prysmian's specification sheets, and would result in exposed copper conductor in the field.

55. Prysmian's Report utilizes industry standards, UL 44 and UL 4703, to evaluate other aspects of the insulation's performance. *See* Exhibit K at 5. However, Prysmian utilized the "GC Method" to evaluate insulation shrinkback even though Prysmian certifies that its product is

---

[10] According to the GC Method, the total sample length is 12 inches with 1 inch stripped at each end. The total allowable percent insulation shrinkback is calculated by dividing the total allowable insulation shrinkback (6 mm, i.e., 3 mm at each end) by the total sample length (10 inches of insulation, i.e., 12 inches with 1 inch removed at each end). *See* Exhibit K at 5. This results in maximum allowable insulation shrinkback of 2.4%.

14

in compliance with UL 44, which includes an insulation shrinkback test procedure and maximum limit. *See id.*

56.    Upon information and belief, Prysmian came up with its own unique testing protocol and insulation shrinkback requirement rather than undertaking a valid scientific analysis to determine root cause, such as utilizing recognized standardized testing employed by UL or ICEA, to avoid admitting that its Prysmian red wire was the source of the unacceptable levels of insulation shrinkback Shoals was observing in the field.

57.    In late 2022, Shoals began to understand that Prysmian was being less than forthcoming with Shoals when numerous other Shoals' customers began reporting similar instances of copper conductor exposure in the field.

58.    It was during this period, for example, that Shoals learned the re-installed harnesses at the initial site were once again exhibiting exposed copper conductor, despite the re-installation and the elimination of the initial wire management concerns raised by Prysmian. Crucially, the replacement installation used Prysmian red wire, which indicated that the defect existed within Prysmian's red wire alone, not with the wire management, as Prysmian initially represented to Shoals.

59.    In or around November 2022, Shoals came to understand that the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback stemming from issues with the polymer insulation on the Prysmian red wire, and is not related to the way in which the Shoals' product was installed by various third parties.

60.    The Prysmian red wire sold to Shoals before 2020 exhibited a history of proper performance, with no instances of unacceptable amounts of insulation shrinkback. To this day, Shoals has never received any reports of unacceptable insulation shrinkback with the Prysmian red

15

wire it purchased and incorporated into its products from approximately 2014 or 2015 through 2019.

61. However, through investigation following additional reports of exposed copper conductor from its customers, as well as third-party testing, Shoals determined that unacceptable amounts of insulation shrinkback were occurring on Prysmian red wire purchased from 2020 through approximately 2022.

62. It is apparent that this insulation shrinkback is a problem unique to Prysmian wire. Even though Shoals uses wire of the same style from other manufacturers in its products, Shoals has not received reports of unacceptable amounts of insulation shrinkback in wire manufactured by any other wire manufacturer, despite being used in the same Shoals' products, on the same solar fields as the Prysmian red wire, and in the same manner as Prysmian red wire.

63. On December 22, 2022, Prysmian recommended that Shoals stop using Prysmian red wire until Prysmian completed additional testing.

64. In or around January of 2023, Prysmian conducted additional testing on Prysmian red wire that had exhibited unacceptable amounts of insulation shrinkback in the field. Rather than utilizing the previously relied upon "GC Method" test, Prysmian tested the wire in accordance with the ICEA Test requirement; specifically, after three test cycles, the insulation shrinkback exceeded the maximum allowable insulation shrinkback of 100 mils (or 0.55%).

65. Prysmian shared the test results with Shoals during a meeting in January 2023. The slide deck presented to Shoals during this meeting is attached hereto as **Exhibit L**. The data presented by Prysmian demonstrates that Prysmian red wire failed the ICEA Test, and Prysmian's representatives acknowledged as much during the January meeting. *See id.* at 2.

66. During the same January meeting, Prysmian claimed that Prysmian red wire "has

been made with the same process and with the same materials since 2016." *Id.*

67. This representation, however, is contradicted by the fact that Shoals used Prysmian red wire from approximately 2016 until 2019 without issue, but unacceptable insulation shrinkback occurred with Prysmian red wire sold to Shoals from 2020 to approximately 2022.

68. Further, Prysmian's suggestion at the conclusion of the presentation that Shoals substitute Prysmian red wire for either (1) Prysmian black wire with red accents or (2) "*reformulated* red with accelerated crosslinking" reinforces that Prysmian was aware that something in its production process for red wire would cause the wire to exhibit unacceptable levels of insulation shrinkback. *See id.* at 6.

69. Given Shoals' successful use of Prysmian wire prior to 2020, the issues identified with Prysmian red wire sold to Shoals from 2020 to approximately 2022 indicate that Prysmian must have changed its process or its oversight of its process during the pandemic. Indeed, in January 2023, a Prysmian representative informed a Shoals employee that Prysmian lacked adequate controls over its cooling bath process and later had to adjust the process.

70. Unacceptable levels of insulation shrinkback of the polymer insulation that covers the copper conductor is known to occur when the insulation is cooled too quickly after extrusion, which locks in residual stresses within the insulation. When the wire is then used and installed, the stresses within the insulation relax, causing the insulation to contract, which results in exposed wire conductor. This contraction process occurs gradually in the field, and therefore would not present while the wire was being used in the Shoals manufacturing process. This is one possible cause of the insulation shrinkback defect in the Prysmian red wire that Shoals incorporated into its products for its customers and end users during this time period.

17

71. Upon information and belief, Prysmian failed to properly control its extrusion process, and thus recklessly departed from industry practice in its production process, which caused Prysmian red wire sold to Shoals between 2020 and approximately 2022 to be defective with unacceptable amounts of insulation shrinkback.

72. Alternatively, Prysmian intentionally or recklessly took other actions or otherwise failed to take actions in its production of the Prysmian red wire that caused Prysmian red wire sold to Shoals from 2020 through approximately 2022 to be defective with unacceptable amounts of insulation shrinkback.

73. Prysmian's failures in its manufacturing process were either a deliberate, intentional, or reckless choice by Prysmian to speed up its wire production, and/or the result of the Prysmian's intentional or reckless failure to monitor the cooling process or other aspects of production. This constitutes a departure from standard industry practice in the production process, and therefore was done with knowledge that such actions or failures to act risked compromising the integrity of its photovoltaic wire.

**Defective Prysmian Red Wire Forced Shoals to Incur Substantial Damages**

74. Per Prysmian's recommendation, Shoals stopped purchasing Prysmian red wire in late 2022 and has since stopped using Prysmian red wire in any of its products. Prysmian no longer manufactures or markets its red wire.

75. As of the filing of this Complaint, Shoals is aware of unacceptable amounts of insulation shrinkback occurring in at least twenty solar fields where Shoals' wire harnesses are installed. The wire experiencing insulation shrinkback at those sites is Prysmian wire, and it is believed that all of that Prysmian wire was sold to Shoals between 2020 and approximately 2022.

18

Shoals is not aware of unacceptable insulation shrinkback on Shoals' products using any other manufacturer's wire.

76.     Shoals' products using Prysmian red wire that was sold to Shoals between 2020 and approximately 2022 are believed to have been used at approximately 300 solar field sites nationwide. Due to the defect in Prysmian red wire and the harm it can cause, Shoals was forced to notify its customers and end users of its products of the potential for insulation shrinkback on red wire in its products. Shoals has also asked customers and end users to provide feedback on their sites. An example of one such notification is attached hereto as **Exhibit M**. Sending such a notification, while necessary in light of the circumstances, has damaged Shoals' reputation and is likely to cause Shoals to incur significant damages to remedy additional instances of unacceptable insulation shrinkback.

77.     Shoals also expects that at least some of these sites will incur property damage as a result of the insulation shrinkback defect. In fact, at least one affected site has already reported property damage arising from a brushfire, which is believed to have ignited as a result of contact with an exposed conductor in Prysmian red wire.

78.     Investigating the extent of the Prysmian insulation shrinkback issue at the sites with known issues has been costly. For example, Shoals has had to hire third parties to conduct on-the-ground monitoring and drone imaging to investigate the Prysmian insulation shrinkback issue.

79.     Furthermore, Shoals now has an excess of Prysmian red wire that it purchased but cannot use. In addition to the costs of the wire, Shoals has incurred damages for having to store this wire. Prysmian has refused to accept the return of this wire.

80.     Shoals also has an excess of other Prysmian wire, including Prysmian black wire, that it purchased but cannot use due to concerns over Prysmian's production processes and the

quality of the wire. Prysmian also has refused to accept the return of this wire. Storing this wire also imposes a financial burden on Shoals.

81.     Remediation of the Prysmian insulation shrinkback issue is also costly. Shoals is currently working with customers and end users to replace affected product and has already incurred significant costs to do so at some sites. Remediation at other sites will not only be extremely expensive, but it will also force Shoals to expend resources that could be utilized elsewhere in its business.

82.     Prysmian continues to evade responsibility and insist that its red wire is safe and in conformity with its representations of quality, despite clear evidence to the contrary. This reckless conduct has caused Shoals to incur significant damages, including investigation, inspection, and remediation expenses.

83.     As of the time of this filing, Shoals has already incurred millions of dollars in damages, and while the full extent of Shoals' damages are still unknown, Shoals anticipates it will expend not less than $9.3 million to remedy Prysmian's defective wire. Furthermore, Shoals has experienced reputational damage and the loss of prospective customers and revenue because of the defective Prysmian wire.

## COUNT ONE
## TENNESSEE PRODUCTS LIABILITY ACT

84.     Shoals realleges and incorporates by reference paragraphs 1 through 83 of this Complaint as though set forth in full herein.

85.     Prysmian's wire was in a defective condition as defined in the Tennessee Liability Act ("TPLA") at the time it left Prysmian's control. *See* Tenn. Code Ann. § 29-28-101 *et seq*.

86.     Prysmian's wire was unreasonably dangerous as defined in the TPLA at the time it left Prysmian's control, as it did not comply with UL or other industry standards. *See id.*

Furthermore, the insulation shrinkback defect poses other dangers, including but not limited to the risk that any individual or property that comes in contact with it will be injured or damaged. In fact, Prysmian's defective wire is believed to have already caused at least one brush fire in one solar field.

87.     The integrity of the Prysmian red wire sold to Shoals from 2020 through approximately 2022 was compromised at the time of production, before the wire left Prysmian's control, and before Shoals obtained it.

88.     Prysmian's manufacturing process and/or oversight failures have caused or will cause Shoals Technologies to incur not less than $9.3 million in damages, including but not limited to:

    a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and end users who have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

    b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

    c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

**COUNT TWO**
**BREACH OF CONTRACT FOR WIRE SOLD UNTIL NOVEMBER 2021**

89.    Shoals realleges and incorporates by reference paragraphs 1 through 88 of this Complaint as though set forth in full herein.

90.    Prysmian issued weekly offers to contract in the form of price sheets to Shoals.

91.    These price sheets incorporated references to Prysmian's specification sheet for its SunGen Photovoltaic wire, which explicitly represented that Prysmian's SunGen Photovoltaic wire, including Prysmian red wire, (1) was manufactured for "interconnection wiring of grounded and ungrounded photovoltaic power systems," (2) could safely handle up to 2000 volts of electricity, and (3) complied with both UL 4703 and 44.

92.    Prysmian's specification sheet therefore became part of Prysmian's offer to contract.

93.    Shoals accepted Prysmian's offers to contract by issuing purchase orders.

94.    Shoals fully performed its obligations under the purchase orders by paying Prysmian in full for the products Shoals received from Prysmian.

95.    The parties therefore entered into a series of contracts with each other. *See* Tenn. Code Ann. § 47-2-204 ("A contract for the sale of goods may be made in any manner sufficient to

22

show agreement, including conduct by both parties which recognizes the existence of such a contract").

96.     Prysmian materially breached the terms of these contracts by supplying Shoals with wire that did not comply with its own specification sheet, in that Prysmian red wire exhibited unacceptable amounts of insulation shrinkback.

97.     Such wire violates Prysmian's contracts with Shoals because it cannot safely interconnect the wiring of grounded and unground photovoltaic wire or handle up to 2000 volts of electricity, nor does it comply with either UL 4703 or UL 44.

98.     As the proximate result of Prysmian's breaches, Shoals has suffered or will suffer damages, including but not limited to the following:

a.   Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and end users who have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b.   Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

c.   Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

> d. Expenses incurred in replacing and repairing Shoals' products, which was necessary because of Prysmian's defective wires; and,
>
> e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

99.     Prysmian's breaches of its contract with Shoals were committed with intentional or reckless disregard of Shoals' rights, particularly in regard to Prysmian's (1) continued reckless denial of wrongdoing, (2) invention of the so-called "GC Method" test, and (3) subsequent attempts to mislead Shoals into believing its defective wire was safe and merchantable, despite knowing or having reason to know that Prysmian red wire was not safe and merchantable.

100.     Shoals is entitled to recover for its damages, including, without limitation, damages to its brand and punitive damages,[11] against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

**COUNT THREE**
**BREACH OF CONTRACT**
**SHOALS' 2021 TERMS AND CONDITIONS**

101.     Shoals realleges and incorporates by reference paragraphs 1 through 100 of this Complaint as though set forth in full herein.

102.     From approximately November 5, 2021 forward, Prysmian continued to issue weekly offers to contract in the form of price sheets to Shoal.

103.     Shoals accepted Prysmian's offers by issuing purchase orders. These purchase orders expressly incorporated Shoals' 2021 Terms and Conditions.

---

[11] Tennessee law permits recovery of punitive damages in breach of contract cases if "a defendant acted either intentionally, fraudulently, maliciously, or recklessly." *Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013).

24

104. Shoals fully performed its obligations under the purchase orders by paying Prysmian in full for the products Shoals received from Prysmian.

105. The parties therefore entered into a series of contracts with each other. *See* Tenn. Code Ann. § 47-2-204 ("A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract").

106. Prysmian materially breached the terms of these purchase orders by violating the 2021 Terms and Conditions as follows:

   a. By supplying Prysmian red wire that was not (1) "free from defects in design, workmanship, and materials," (2) "designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] needs," (3) "fit for the purposes intended by [Shoals] and its OEM customers," and/or "conform[ing] to all applicable laws, orders, regulations, and standards in countries where the products [were] to be sold";

   b. Providing Shoals with wire that failed to meet the minimum quality standards, including UL certification and Prysmian's "performance specifications published" in its specification sheets; and,

   c. Declining to uphold its obligation to, at no cost to Shoals, "assist [Shoals] in evaluating and resolving any detected quality problems" and "cooperate with [Shoals] to identify and or remedy any defect, default, claim of defect or other problem or quality issue relating to the Products (and related systems and components)."

107.     Prysmian's breaches have caused Shoals to incur damages as outlined below:

a.   Costs incurred in "inspecting, sorting, storing, reworking, repairing or replacing the nonconforming" Prysmian red wire, including expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, which is included but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

b.   Costs incurred as a result of production interruptions caused by the defective Prysmian red wire;

c.    Expenses incurred as a result of Shoals' customers and/or end user's "field service actions or other corrective service actions"; and,

d.   Costs resulting from reimbursing Shoals' customers and/or end users for "property damage caused by" Prysmian's red wire, including "reasonable attorneys' fees and other professional fees, settlements and judgments incurred by [Shoals] and other costs associated with [Shoals'] administrative time, labor, and materials."

108.     Prysmian's breaches of the 2021 Terms and Conditions were committed with intentional, or at least reckless, disregard of Shoals' rights, particularly in regard to Prysmian's (1) continued reckless denial of wrongdoing, (2) invention of the so-called "GC Method" test, and (3)

subsequent attempt to mislead Shoals into believing its defective wire is safe and merchantable, despite knowing or having reason to know that Prysmian red wire is not safe and merchantable.

109. Shoals is entitled to recover for its damages, including, without limitation, expenses it has incurred in inspections and remediation, damages to its brand, and punitive damages,[12] against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT FOUR
## UNJUST ENRICHMENT (In the Alternative to Counts II and III)

110. Shoals realleges and incorporates by reference paragraphs 1 through 109 of this Complaint as though set forth in full herein.

111. In the alternative to Counts II & III, Shoals alleges that it conferred a benefit upon Prysmian, namely, the monetary value for the goods outlined in its purchase orders for wire.

112. It would be inequitable for Prysmian to retain the full monetary value it received from the purchase orders without providing merchantable product to Shoals.

113. Shoals is entitled to recover for its damages against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT FIVE
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

114. Shoals realleges and incorporates by reference paragraphs 1 through 113 of this Complaint as though set forth in full herein.

115. In every contract or agreement there is an implied promise of good faith and fair dealing.

---

12 *See Riad*, 436 S.W.3d at 276.

116.    Shoals and Prysmian entered into contracts, including without limitation and in pertinent part through purchase orders from 2020 until approximately 2022, including the purchase orders modified by the 2021 Terms and Conditions.

117.    Shoals performed all of the significant acts that each of the above-referenced contracts required it to do and/or was excused from performing those acts.

118.    All conditions required for Prysmian's performance under the above-referenced contracts occurred.

119.    Prysmian unfairly interfered with Shoals' right to receive the benefits of each of the above-referenced contracts by acting in bad faith and without fair dealing, including without limitation by: (1) not informing Shoals of changes to its processes, or oversight thereof, that could lead to defective wire being produced, (2) providing defective wire to Shoals knowing that Shoals was incorporating the wire into extensive EBOS projects across the country, (3) its continued intentional or at least reckless denial of wrongdoing, (4) its invention of the so-called "GC Method" test, and (5) its continued attempts to mislead Shoals into believing its defective wire is safe and merchantable, despite knowing or having reason to know that Prysmian red wire is not safe and merchantable.

120.    Shoals was harmed by Prysmian's conduct, and has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

> a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and/or end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

28

b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or its end users related to the insulation shrinkback defect in Prysmian's wire;

c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

121.    Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT SIX
## BREACH OF EXPRESS WARRANTY

122.    Shoals realleges and incorporates by reference paragraphs 1 through 121 of this Complaint as though set forth in full herein.

123.    Prysmian provided Shoals with conductor wire that no reasonable wire manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unsafe and unfit for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

124.    Prysmian breached the following express warranties of merchantability:

29

a. Prysmian's specification sheets, which represented that Prysmian's wire met industry standards, including UL 44 and UL 4703;

b. Industry standards generally required by manufacturers of similar products;

c. For purchase orders placed after November 5, 2021, the "Product Warranties" included in the 2021 Terms and Conditions, namely, the warranties representing that Prysmian would supply only wire that was (1) "free from defects in design, workmanship, and materials," (2) "designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] needs," (3) "fit for the purposes intended by [Shoals] and its OEM customers," and/or "conform[ing] to all applicable laws, orders, regulations, and standards in countries where the products [were] to be sold"; and,

d. For purchase orders placed after November 5, 2021, the minimum "Quality" standards outlined in the 2021 Terms and Conditions, including the warranties representing that Prysmian's wire would (1) "be certified to UL" and (2) conform with the "performance specifications published in [Prysmian's] product portfolios, datasheets, etc."

125. Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and/or end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

30

b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or its end users related to the insulation shrinkback defect in Prysmian's wire;

c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d.  Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e.  Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

126.  Shoals is entitled to recover for its damages against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT SEVEN
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

127.  Shoals realleges and incorporates by reference paragraphs 1 through 126 of this Complaint as though set forth in full herein.

128.  Prysmian provided Shoals with conductor wire that no reasonable manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unfit and unsafe for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

129.  In connection with Prysmian's sale of the photovoltaic wire to Shoals, Prysmian impliedly warranted that the photovoltaic wire would be of merchantable quality. *See* Tenn. Code

31

Ann. § 47-2-314. As such, Prysmian impliedly warranted the products would be usable, i.e., not inherently dangerous due to defective insulation that exhibits unacceptable amounts of insulation shrinkback.

130.     Prysmian breached this implied warranty by supplying to Shoals photovoltaic wire with defective insulation that exhibits unacceptable amounts of insulation shrinkback, which rendered the photovoltaic wire dangerous and unfit, and thus, not merchantable.

131.     Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

    a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

    b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

    c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

    d.  Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which good reputation has been tarnished by Prysmian's misconduct, resulting in lost sales.

132. Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT EIGHT
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

133. Shoals realleges and incorporates by reference paragraphs 1 through 132 of this Complaint as though set forth in full herein.

134. Prysmian provided Shoals with conductor wire that no reasonable manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unfit and unsafe for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

135. Prysmian knew Shoals was purchasing its SunGen photovoltaic wire for the particular purpose of utilizing it as a "single conductor" for the "interconnection wiring of grounded and ungrounded photovoltaic power system." *See* Exhibit B. This use was outlined in Prysmian's own specification sheet, and Prysmian knew Shoals was relying on it to manufacture and provide Shoals with photovoltaic wire suitable for this particular purpose.

136. Prysmian was also aware of the particular purpose for which Shoals purchased its Prysmian red wire because Prysmian representatives visited Shoals' headquarters in Tennessee and communicated regularly with Shoals. Prysmian therefore knew or should have known how Shoals used its Prysmian red wire in its production process, as well as how Shoals' customers and end users would utilize Shoals' final product in the solar field.

137. Furthermore, for purchase orders post-dating November 5, 2021, Prysmian expressly warranted that its Prysmian red wire would be "designed, manufactured, and assembled

33

by" Prysmian based upon Shoals' "stated use and be fit for the purposes intended by" Shoals, Shoals' customers, and end users.  *See* Exhibit E § 7.

138.    Under Tennessee law, Prysmian impliedly warranted that the subject wire would be fit for that particular purpose.  *See* Tenn. Code Ann. § 47-2- 315.

139.    Prysmian breached this implied warranty by supplying photovoltaic wire that could not uphold the particular purpose outlined in its specification sheet and made clear to Prysmian's representatives during their communications with Shoals and visits to Shoals' headquarters in Tennessee.

140.    Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

    a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

    b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and end users related to the insulation shrinkback defect in Prysmian's wire;

    c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d.  Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e.  Damages and injury to Shoals' good reputation in the industry, which good reputation has been tarnished by Prysmian's misconduct, resulting in lost sales.

141.    Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, exceeds the jurisdictional threshold of this Court.

**COUNT NINE**
**EXPRESS INDEMNITY**

142.    Shoals realleges and incorporates by reference paragraphs 1 through 141 of this Complaint as though set forth in full herein.

143.    Shoals has incurred direct, out-of-pocket expenses and losses resulting from or related to Prysmian's supply of defective photovoltaic wires.

144.    In the 2021 Terms and Conditions, Prysmian expressly agreed to indemnify Shoals "against any and all losses, damages, liens, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, as incurred) arising in connection" with any causes of actions or claims arising out of, among other things, "(1) Supplier's breach of its obligations, covenants, representations or warranties" and "(2)  any negligent act, willful omission or willful misconduct of Supplier, its employees or any individuals involved in the fulfillment of Supplier's obligations under these Terms or any Order." *See* Exhibit E § 8.

145.    The 2021 Terms and Conditions go on to clarify that Prysmian shall also indemnify Shoals with respect to any damages incurred due to "injury to, or death of, persons or damage to real and tangible personal property caused by Supplier, its employees, or any individual involved

in any manner in the performance of the Services performed under these Terms or any Order." *See id.*

146.    Shoals, in accordance with the 2021 Terms and Conditions, provided Prysmian "with prompt written notice" of these claims. *See id.*.

147.    Nonetheless, Prysmian has refused to indemnify Shoals and failed to uphold its express duty to indemnify Shoals against the current claims against it, and this behavior indicates Prysmian has no intention of indemnifying Shoals from future claims either.

148.    Prysmian has therefore violated the indemnity provisions of the 2021 Terms and Conditions.

149.    Shoals is entitled to full indemnification from Prysmian for such claims, expenses and losses, including but not limited to its attorneys' fees.

## COUNT TEN
## EQUITABLE INDEMNITY

150.    Shoals realleges and incorporates by reference paragraphs 1 through 149 of this Complaint as though set forth in full herein.

151.    Shoals has incurred direct, out-of-pocket expenses and losses and had claims asserted against it resulting from or related to Prysmian's supply of defective photovoltaic wires.

152.    Prysmian, as the surviving entity after merging with General Cable, is the entity that manufactured and sold defective photovoltaic wires, and by law, it has an equitable obligation to defend and indemnify Shoals against such claims, expenses and losses.  To date, Prysmian has failed and refused to defend and indemnify Shoals against such claims, expenses and losses.

153.    As a matter of equity, Shoals is entitled to full indemnification from Prysmian for such claims, expenses and losses, including the attorneys' fees and other costs Shoals has incurred,

and will continue to incur, from defending itself against such claims. Nonetheless, Prysmian has declined to uphold its equitable duty.

## COUNT ELEVEN
## INTENTIONAL MISREPRESENTATION

154.    Shoals realleges and incorporates by reference paragraphs 1 through 153 of this Complaint as though set forth in full herein.

155.    Shoals engaged Prysmian as a supplier of photovoltaic wire based upon its misrepresentations that its SunGen Photovoltaic Wire, including Prysmian red wire, was (1) suitable for "interconnection wiring of grounded and ungrounded photovoltaic power systems," (2) could safely handle up to 2000 volts of electricity, and (3) complied with both UL 4703 and 44. *See* Exhibit B.

156.    Shoals then continued to use Prysmian as its supplier for Prysmian red wire even after discovery of exposed copper conductor in the field based on Prysmian's misrepresentations regarding the cause of the issue and the quality of its Prysmian red wire, some of which continue to this day. These misrepresentations include, but are not limited to, the following:

> a.   Prysmian's development of its misleading "GC Method" test, which it then utilized to misrepresent to Shoals that its Prysmian red wire was still merchantable and fit for its intended use;
>
> b.   Prysmian's claim during the January 2023 meeting that Prysmian red wire "has been made with the same process and with the same materials since 2016," *see* Exhibit L at 2, despite its knowledge to the contrary; and,
>
> c.   Prysmian's continued failure to inform Shoals, as well as its other customers, that it altered or failed to properly monitor its production process during the

COVID-19 pandemic in a manner that compromised the polymer insulation on its Prysmian red wire.

157. Shoals justifiably relied on these misrepresentations, including the material omissions, when it decided to issue purchase orders to Prysmian, and when it decided to continue its commercial relationship with Prysmian after Prysmian red wire began exhibiting exposed copper conductor in the field.

158. Shoals would not have issued these purchase orders if it was aware of the true state of affairs, namely, that:

 a. Prysmian failed to take adequate precautions, including but not limited to providing adequate oversight or adequate cooling time for wire, in its production process, therefore not setting the bench mark for quality in the industry, as the defective wire falls far below customer expectations and industry standards; and,

 b. Prysmian red wire could not meet the standards outlined in its specification sheet, including UL 44 or other industry standards.

159. Shoals reasonably relied upon Prysmian's false representations of material information in the manner described herein.

160. Prysmian never informed Shoals of changes to its production processes and/or its failure to properly oversee its processes, despite its duty to inform its customer, Shoals, that its production process and/or lack of oversight of the same threatened the integrity of the Prysmian red wire's insulation.

161. As the proximate result of Prysmian's wrongful statements and/or omissions, Shoals has suffered or will suffer damages, including but not limited to the following:

a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and end users related to the insulation shrinkback defect in Prysmian's wire;

c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d.  Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e.  Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

162.    Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

163.    Prysmian's misrepresentations, omissions and misconduct were intentional, deliberate and malicious, committed with the intent to harm Shoals, and/or with reckless disregard of Shoals' rights. Consequently, Shoals is entitled to punitive damages against Prysmian.

## COUNT TWELVE
## NEGLIGENCE

164.   Shoals realleges and incorporates by reference paragraphs 1 through 163 of this Complaint as though set forth in full herein.

165.   Prysmian owed its customer, Shoals, a duty to produce photovoltaic wire in a reasonable fashion.

166.   A reasonably prudent manufacturer of photovoltaic wires would have ensured that its manufacturing process produced photovoltaic wire that was safe for its intended use.

167.   Prysmian breached this duty by utilizing a manufacturing process and/or oversight process that was contrary to industry practice and produced defective wire.

168.   Prysmian continues to breach this duty by failing to adopt adequate testing for insulation shrinkback or notify its customers of the insulation shrinkback defect with its red wire.

169.   This breach proximately caused, and continues to cause, injuries to Shoals, including without limitation for any damages to Shoals' customers and/or end users for which Shoals incurs damages.

170.   Shoals has therefore incurred damages as a result of Prysmian's breach of this duty for any property damage or injury caused by Prysmian's defective product.

171.   Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT THIRTEEN
## GROSS NEGLIGENCE

172.   Shoals realleges and incorporates by reference paragraphs 1 through 171 of this Complaint as though set forth in full herein.

173.    Prysmian owed its customer, Shoals, a duty to produce photovoltaic wire in a reasonable fashion.

174.    A reasonably prudent manufacturer of photovoltaic wires would have ensured that its manufacturing process produced photovoltaic wire that was safe for its intended use.

175.    Prysmian breached this duty by intentionally, or at least recklessly, failing to monitor its manufacturing process and/or changing its manufacturing process.

176.    Prysmian continues to breach this duty by intentionally, or at least recklessly, failing to adopt adequate testing for insulation shrinkback or notify its customers of the insulation shrinkback defect within its red wire.

177.    This breach proximately caused, and continues to cause, injuries to Shoals, including without limitation for any damages to Shoals' customers and/or end users for which Shoals incurs damages.

178.    Shoals has therefore incurred damages as a result of Prysmian's breach of this duty due to property damage caused by Prysmian's defective product.

179.    Prysmian's misconduct was intentional or reckless, committed with the intent to harm Shoals, and/or with reckless disregard of Shoals' rights. Consequently, Shoals is entitled to punitive damages against Prysmian.

180.    Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT FOURTEEN
## STRICT LIABILITY

181. Shoals realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as though set forth in full herein.

182. Prysmian manufactured and sold photovoltaic wire, including the defective wires discussed herein, in an unreasonably dangerous condition, i.e., the integrity of its photovoltaic wire was unsuitable due to failures in its production process.

183. This rendered the photovoltaic wire unreasonably dangerous, due to the human safety risk of encountering an exposed conductor and due to the fire risk of an exposed conductor.

184. Prysmian knew that its photovoltaic wire would be incorporated into Shoals' EBOS projects across the country with minimal to no change to its condition.

185. Prysmian is therefore liable for the property damage that has occurred or will occur as a result of the defective wire, as well as any physical injury that may arise due to this defective wire.

186. Shoals has incurred and continues to incur expenses relating to property damage caused by the defective Prysmian wire.

187. Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, exceeds the jurisdictional threshold of this Court.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Shoals prays:

a) That proper process issue to be served upon the Defendant requiring them to answer this Complaint within the time prescribed by law;

b) That Shoals be afforded the opportunity to present its claims, as alleged herein;

42

c)       That a judgment be awarded to Shoals and against Defendant for compensatory damages in an amount to be proven at trial, but in any event not less than $9.3 million, as to each of the above Counts;

d)       That a judgment be awarded to Shoals and against Defendant for punitive damages on Shoals' intentional breach of contract claims (Counts Two and Three), intentional misrepresentation claim (Count Eleven), and gross negligence claim (Count Thirteen);

e)       That a judgment be awarded to Shoals and against Defendant for all costs and expenses, including attorneys' fees, incurred by Shoals as permitted under the 2021 Terms and Conditions and/or as permitted by applicable law in an amount to be proven at trial as to each of the above Counts; and

f)       That Shoals be awarded all other costs, prejudgment and post-judgment interest, and such other legal and equitable relief to which it is justly entitled.

DATED: October 31, 2023

Respectfully submitted,

/s/ Jessalyn H. Zeigler
Jessalyn H. Zeigler (TN Bar No. 016139)
Jeffrey Gibson (TN Bar No. 026321)
Courtney A. Hunter (TN Bar No. 038014)
**BASS, BERRY, & SIMS PLC**
150 Third Avenue South Suite 2800
Nashville, TN 37201
(615) 742-6289

jzeigler@bassberry.com
jgibson@bassberry.com
courtney.hunter@bassberry.com

James B. Manley, Jr. (*pro hac pending*)
Jill C. Kuhn (*pro hac pending*)
**Troutman Pepper Hamilton Sanders LLP**

43

600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3000

Jim.Manley@Troutman.com
Jill.Kuhn@Troutman.com


*Attorneys for Plaintiff*