# Exhibit C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SHOALS TECHNOLOGIES GROUP, LLC, Plaintiff, | : | |
| Vs. | : | Case No. 3:23-cv-01153 |
| PRYSMIAN CABLES AND SYSTEMS USA, LLC, Defendant. | : | |

***************************************

VIDEOTAPED / REALTIMED DEPOSITION OF
JAMES L. SALMON, Ph.D., P.E.
APRIL 28, 2026
VOLUME 1

***************************************

Stenographically Reported by:

PAT ENGLISH-ARREDONDO, CSR(TX), RMR, CRR, CLR

**disclose the results of those tests in your first working file?**

A. And characterized as not disclosing? I mean, we -- because I've said, we ran some adhesion tests of the Southwire adhesion force, but I didn't rely on that.

**Q. Okay. But they were considered. There were test results that were generated. Correct?**

A. Yes.

**Q. Okay. And those test results were looked at by members of your team at Fusion. Correct?**

A. Yes.

**Q. Okay. And you looked at those test results. Correct?**

A. Yes.

**Q. Okay. And those test results are not included in your working file. Correct?**

A. I didn't rely on them; so no, they are not included in my working file.

**Q. You considered them, but you didn't rely upon them. And because you didn't rely upon them, you didn't put them in your working file?**

A. I didn't put them in my file, that's right.

**Q. Including your working file?**


Case 3:23-cv-01153 Document 217-3 Filed 09/15/26 Page 3 of 15 PageID #: 9432

A. I only have one file.

**Q. Okay.**

MR. MANLEY: What exhibit number are we on now?

MS. KUHN: 1824.

**Q. (By Mr. Manley) Okay. Let me show you what we're going to mark as Exhibit 1824, which is a composite exhibit of 94 pages.**

**These are pictures of at least 88 harnesses where testing was run on 88 separate harnesses and no test results were provided that correlate with those tests.**

(Marked was Salmon Exhibit No. 1824.)

A. (Reviewing.)

**Q. (By Mr. Manley) And I'm not saying that's everything. I'm just saying on a quick review over the last couple of days, those are the ones that we were able to put our hands on.**

A. How do you know these are tested harnesses or --

**Q. Because there's before-and-after pictures.**

A. (Reviewing.) But these could have been just ones that we cut up. I don't -- I don't know that these are ones that were tested but...

They may not have been pull -- pull tests. They may have been cut. I don't know. I would have to go back and look at these samples.

**Q. I'm going to represent to you on my -- on my honor that there were tests run on those.**

A. Okay. If you say so.

**Q. Okay. Why didn't we get the test results, at a minimum, in the working file?**

A. You got all of our pull tests results of the red Prysmian wire that we pulled from the harness. You've got every single one of them.

**Q. Okay. We will take it in pieces.**

**We did not get the test results on adhesion pull tests of Southwire wire, right?**

A. Correct.

**Q. Why not?**

A. We didn't rely on them.

**Q. Okay. But you considered them?**

A. When I -- when I said we tested the Southwire, we were looking for big differences in pull-out force. We're looking for numbers to see, okay, does Southwire provide significantly higher adhesion forces than Prysmian? And the answer was no.

So I was looking for something more like

200 pounds or 300 pounds, something that was much, much bigger than Prysmian, and it wasn't.
So there was nothing we could conclude from that, other than it stuck to the wire when there was adhesions, with the same amount of adhesion as the Prysmian ones that didn't pull out.
**Q. The tests that were run on the cut-up harnesses' T junctions with Southwire wire, there was data that was generated from those tests; and it was not disclosed in any form or fashion in either your report or your working file. Correct?**
A. Correct.
**Q. Okay. And that's the same with every one of these 88. There are -- there was test data that was generated. And you can look. They have all been pulled out (tendering).**
**The after picture is on top; the before picture is on the bottom. There were test results, for the 88 that we could put our hands on in the last couple of days, of tests that were run on harnesses that were cut up where the test date was not disclosed after the test data was reviewed by Fusion. Correct?**
A. No. No, that's -- you've got all our pull-out force test data of the red Prysmian wire.

We didn't -- we didn't disclose the pull-out force of the Southwire. It was my understanding we turned over the material relied on. But we turned over all the test data for the pull-out testing we did on the red Prysmian wire.

MR. MANLEY: Lucas, can I have your book? We've only got two.

MR. ELLIOT: Oh, this one?

MR. MANLEY: Yes.

MR. ELLIOT: Oh, sorry. This one.

(Tendering.)

MR. MANLEY: Thanks.

**Q. (By Mr. Manley) Let's look at Page No. 2. What is PC031-155?**

A. I'm assuming it's the photo number.

**Q. This is Fusion's created document. What is 2-20?**

A. So it would be more than likely the wire manufacture date.

**Q. Okay. And what is 315046? Is that the foot marker?**

A. I believe so, yes.

**Q. And 2B is one of the sections of the T after it's been cut or cubed up, right?**

A. Its' the B side of the second T in the

A. Yes. But -- yes.
**Q. Okay. We didn't get any of that.**
A. I didn't rely on it. It was a misrepresentation of the amount of force between the insulation and the -- and the T joint. Now that's what's missing.
We tested originally and we were getting numbers that weren't representative of the actual interference between -- or the adhesion or friction between just the insulation and the T because with the wire being in there, you can understand it's much, much stiffer.
And so it could create additional forces that don't really exist between the T and the insulation. So that's what we're missing here. That's why we didn't artificially rely on numbers that would misrepresent what we're showing.
**Q. But the data was reviewed, right?**
A. Yes.
**Q. Test results was reviewed. It was reviewed by Kevin and it was reviewed by you?**
A. By me, yeah.
**Q. All right.**
A. Yeah. And we concluded from an engineering perspective that that's not

where -- we're generating forces that we're not looking for.

**Q. All right. Let's look at Page 26. This is Picture No. PC041-414, Wires manufactured March of '20. Foot Line 283344.**

**Correct?**

A. Yes.

**Q. And we're looking at 1A and 1B, and pictured above is 1B. Right?**

A. Yes.

**Q. And down below are both 1A and 1B with Sharpie marks on there to show the amount of discoloration or insulation movement. Right?**

A. Yes.

**Q. Okay. Would it surprise you to learn that it took 29 pounds of force to pull this conductor out of this cut-up T assembly?**

A. This wire with the conductor out of the T assembly, no, it wouldn't surprise me.

**Q. Okay. But that's certainly higher than the 28.3 that you report on your tests where the conductor has been removed.**

A. Yeah. I mean, that's the whole -- that's the whole reason why we're only looking at ones with the conductor removed because there's -- as I said,

**that we found between Neuhalfen's deposition and today's deposition.  Are there any other tests that were run?**

A.    I don't know.  I would have to go back and look to see.  I mean, I've turned over all of the data that I relied on to form my opinions.

**Q.    The law is not --**

A.    And --

**Q.    -- relied on, in fairness.**

MR. LEVY:  The law --

MR. ELLIOT:  Hang on, hang on, hang on.  Let him finish.

**Q.    (By Mr. Manley)  And the law is considered.**

MR. ELLIOT:  Let him dig his own hole.

**Q.    (By Mr. Manley)  The law is considered.**

**So I'm just asking, did Fusion run any other test of any sort in this matter where the data was not disclosed to the plaintiffs?**

A.    You've got all the data that I relied on to form my opinions.  And I don't know -- I gave you the -- I explained why we didn't rely on this stuff (indicating), because it wasn't -- it didn't give the results that were clean.

They -- you know, they were -- they were confounded results because we left the conductor in with these.

And you didn't get the results of the Southwire pull-out because it didn't really show any difference than the Prysmian pull-out, adhesion force.

But that's really all I think that you hadn't received. I mean, those are the only things that come to my mind right now.

**Q. Okay. But there might be others?**

A. I don't know that. I don't know if there is or not. I could go back and talk to the team and see if we ran anything else but...

MR. MANLEY: Okay. Well, we're going to -- we're going to go to the Court and we're going to ask for all of the data --

(Simultaneous cross-talk.)

MR. ELLIOT: We might go to the Court.

MR. MANLEY: We're going to go to the Court and ask for all the data on all the tests that were run by Fusion.

And we're going to ask for the deposition of Mr. Jones, and we might ask for the

deposition of someone else at Fusion.

And then we're going to come back, once we have the chance to digest all of that data, which we don't have, and once we have the chance to digest the new working file and new test data that you gave us today, and then we will recommence with Dr. Salmon's deposition.

MR. ELLIOT: You really should coordinate better with Jessie. I'm going to read into the record a December 29, 2025 email from Jessie Zeigler, lead counsel for Shoals, to us regarding the expert depositions.

And I will read the second paragraph from Ms. Zeigler.

(As read): "We also suggest the parties agree to exchange discoverable portions of the testifying experts' working files by January 15 so both parties have the information prior to taking the experts' depositions.

"By 'working file,' we refer to any data that they relied upon, documentation of the compensation they have been paid, and communications with counsel to the extent they were not exempt from discovery under Federal Rules of Civil Procedure 26(c)(4). Please advise if this is agreeable."

That is what we've been operating under. We have produced, as he said, everything he relied upon. That's fine. I have no objection to producing the rest of his file. He's already explained it to you. That's fine.

I will, however, demand a response, declarations from each of your experts, that they have likewise produced to us everything they reviewed --

MR. MANLEY: No problem.

MR. ELLIOT: -- not just what they relied upon, what they reviewed.

MR. MANLEY: No problem.

MR. ELLIOT: Because if that's the new test --

MR. MANLEY: That's the test.

MR. ELLIOT: -- that you want to with, I expect each of your experts to likewise represent that we've got it all. And if we don't, I'm going to demand supplemental depositions from them.

MR. MANLEY: More than happy to --

MR. ELLIOT: I will make him available for deposition for the remainder of the time. You can have him.

I will certainly oppose you deposing anybody else from them, unless you want to make all of your people -- you know, secondary people available also. So...

MR. MANLEY: We are happy to give you those declarations. All right. We are done for today.

MS. KUHN: Should we mark Jim's report? What is that -- did we mark it?

THE WITNESS: Yeah, my version of it we marked. I'll give you that one.

MR. ELLIOT: No, not the old one. I think only the new one.

MS. KUHN: Yeah, 1825.

MR. ELLIOT: 1825.

THE WITNESS: The new one? The response?

MS. KUHN: I'm sorry --

MR. MANLEY: No, no, no. We marked that. The big one, the original one.

THE WITNESS: Okay.

(Marked was Salmon Exhibit No. 1825.)

THE WITNESS: So I leave this with the court reporter?

MR. MANLEY: Yes. Thank you.

COUNTY OF HARRIS )
STATE OF TEXAS )

REPORTER'S CERTIFICATION

I, Pat English-Arredondo, CSR (TX), RMR, CRR, CLR, Certified Shorthand Reporter in and for the State of Texas, hereby certify that this transcript is a true record of the testimony given and that the witness was duly sworn by the officer.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 1st day of May, 2026.

Pat English-Arredondo

Pat English-Arredondo,
CSR (TX), RMR, CRR, CLR
Expiration Date: 4/30/2028

Local Affiliate Reporter for:
Harpeth Court Reporters
2000 Mallory Lane
Franklin, Tennessee 37067
Phone: 615.933.6786